

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00199-CV

———————————————————

TEXAS HEALTH HARRIS METHODIST HOSPITAL FORT WORTH,
Appellant and Appellee

V.

STEPHEN FEATHERLY, Appellee and Appellant

On Appeal from County Court at Law No. 3
Tarrant County, Texas
Trial Court No. 2016-003319-3

Before Birdwell, Wallach, and Walker, JJ.
Opinion by Justice Birdwell
Dissenting Opinion by Justice Walker

## OPINION

In this case, a hospital filed a statutory lien against an emergency room patient's personal injury cause of action, and the patient brought this declaratory judgment action to challenge the validity of the hospital's lien. The trial court ultimately declared the lien partially valid for a lesser amount and partially invalid for the remainder and awarded the patient attorney's fees in an amount almost quadruple the lien amount originally asserted by the hospital. Both sides appealed. Due to the erroneous exclusion of the hospital's evidence of ratification, we reverse and remand for a new trial.

### I.    BACKGROUND

On March 13, 2014, Appellee Stephen Featherly was injured in a motor vehicle accident. He was transported to Appellant Texas Health Harris Methodist Hospital Fort Worth (the Hospital) for treatment. After signing an admission acknowledgment and consent form confirming his agreement to pay for any treatment to be provided, Featherly was treated in the emergency room for roughly three and a half hours before he asked to be discharged.

Shortly thereafter, the billing department of the Hospital sent Featherly a patient account statement, dated March 20, 2014, seeking payment in the amount of $13,575.10 for the medical care rendered in its emergency room. The statement identified Featherly as a "self-pay" patient and credited him with an uninsured discount/adjustment of $11,106.90 against the total charges of $24,682.00, resulting in the $13,575.10 account balance. The statement indicated that the deadline for payment was April 7, 2014.

2

On April 1, 2014, the Hospital's legal department received a letter from attorney James Jinks, who stated that he and his law firm represented Featherly for injuries sustained. The letter enclosed a HIPAA-compliant medical authorization executed by Featherly and requested "a copy of an itemized billing statement for services" rendered as a result of the accident on March 13, 2014.

The billing department of the Hospital thereafter sent Featherly a second statement, dated April 14, 2014, seeking past due payment of the original adjusted account balance of $13,575.10. Neither this statement nor the original statement that was sent to Featherly personally itemized the individual charges for the services rendered.

Subsequently, the Hospital forwarded to Jinks two sworn affidavits of billing records, dated May 8, 2014, and June 5, 2014, respectively. Each affidavit attested to an account balance for services rendered in the "full amount" of $24,682.00, and each attached a "Patient Account Summary" and either an itemized statement or computer printout of the charges and codes for the individual services rendered. The affidavits further attested: "The service(s) provided were necessary and the amount charged for the service(s) was reasonable at the time and place that the service(s) were provided." In this manner, the affidavits met the admissibility requirements of Section 18.001 of the Texas Civil Practice and Remedies Code, which provides for civil actions asserting claims for personal injuries:

> Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

Tex. Civ. Prac. & Rem. Code Ann. § 18.001(b) (setting forth admissibility requirements).

With the Hospital newly aware of the possibility that Featherly could obtain a judgment or settlement for damages arising out of the underlying accident, on May 9, 2014, the Hospital filed a statutory hospital lien with the county clerk of Tarrant County. *See* Tex. Prop. Code Ann. § 55.002(a) ("A hospital has a lien on a cause of action or claim of an individual who receives hospital services for injuries caused by an accident that is attributed to the negligence of another person."). The lien did not specify an amount due. *See id.* § 55.005(b) (providing that the notice filed need only contain the injured individual's name and address, the date of the accident, the name and location of the hospital claiming the lien, and the name of the person alleged to be liable for damages arising from the injury, if known). Once it filed the executed lien, the Hospital faxed a copy of it to Jinks.

After filing its lien, the Hospital sent three additional statements to Featherly dated May 15, June 15, and July 25, 2015. The amount due reflected on each of these statements was $24,682.00; they no longer reflected an uninsured discount/adjustment. The Hospital explained that this was due to the possibility of Featherly's recovery of

damages against a negligent third party, thereby rendering him "insured" for purposes of payment.

On August 20, 2015, Jinks filed a personal injury lawsuit on Featherly's behalf against the driver of the other vehicle involved in the accident, Jennifer Rose Applebaum. In addition to alleging a negligence cause of action, the original petition sought damages including "reasonable expenses for necessary health care, including rehabilitative services and devices, resulting from the injuries he sustained in the occurrence in question." More specifically, the petition alleged that Featherly had "incurred $149,481.75 in past medical expenses."

On October 19, 2015, Featherly responded to an interrogatory propounded by Applebaum seeking the specific amounts "of any and all hospital, doctor, medical or pharmaceutical expenses" that he claimed to have incurred because of the underlying accident. His sworn response identified fifteen health care providers, including the Hospital, and enumerated the charges for all fifteen, including $24,682.00 for the Hospital, with the cumulative amount incurred of $159,367.33. On January 27, 2016, Jinks responded to a request for disclosure of the amount and method of calculating Featherly's economic damages by identifying the same providers and enumerating the same individual and cumulative amounts charged. *See* Tex. R. Civ. P. 194.2(d).

On March 2, 2016, Featherly executed a "Confidential Settlement Agreement and Release" with Applebaum whereby he agreed to accept $500,000.00 in full and final

settlement of his cause of action against her and, upon payment of this amount, to fully release and discharge her from any further liability arising from the underlying accident.

To effectuate the settlement, on March 4, 2016, the claims adjuster for Applebaum's liability insurer sent her defense attorney a check payable to "STEPHEN FEATHERLY & JAMES JINKS AND COURT CLERK FOR THE BE[NEFIT] OF HARRIS METHODIST FORT[] WORTH" in the amount of $24,682.00, the same amount the Hospital had claimed since first contacted by Jinks on behalf of Featherly and the same amount asserted by Featherly and Jinks as reasonable and necessary charges by way of Featherly's pleadings and discovery responses.

On March 10, 2016, Featherly and Applebaum filed a joint motion in the trial court seeking dismissal of the lawsuit in its entirety with prejudice. The next day, March 11, 2016, the trial court entered an Agreed Order of Dismissal with Prejudice granting the relief jointly requested.

On April 14, 2016, the claims adjuster for Applebaum's liability insurer sent Jinks another check payable to "DISTRICT CLERK OF TARRANT COUNTY FOR THE BENEFIT OF HARRIS METHODIST FORT [WORTH,] STEPHEN FEATHERLY, & HIS ATTORNEY, JAMES [JINKS]" in the same amount of $24,682.00.

On May 24, 2016, Featherly filed this lawsuit against the Hospital and Texas Health Huguley, Inc. (Huguley) seeking a declaratory judgment that the liens filed by both hospitals were invalid because the amounts charged for the services rendered by

each exceeded "a reasonable and regular rate" for hospital and emergency medical services, citing Texas Property Code Section 55.004(d)(1), (g)(1).[1] *See* Tex. Prop. Code Ann. § 55.004(d)(1), (g)(1); *see also Daughters of Charity Health Servs. of Waco v. Linnstaedter*, 226 S.W.3d 409, 411 (Tex. 2007) (confirming that the amount of a hospital lien cannot exceed a reasonable and regular rate). As to the Hospital, the original petition asserted that an independent audit commissioned by Featherly had determined that the $24,682.00 charge exceeded the reasonable and regular rates for its services. On this basis, the prayer for relief sought a declaration that the Hospital's lien was invalid and sought attorney's fees and court costs for obtaining such relief.

On June 6, 2016, the claims adjuster for Applebaum's liability insurer sent yet another check to Jinks, this one made payable to "STEPHEN FEATHERLY AND HIS ATTORNEY JAMES A JINKS" in the exact amount for which the new lawsuit sought a declaration of invalidity for the Hospital's lien due to its exceeding reasonable and regular rates.

On June 30, 2016, the Hospital filed a general denial. On September 29, 2016, the Hospital filed an amended answer adding to its general denial the affirmative defenses of waiver, equitable estoppel, and quasi-estoppel, asserting that Featherly should be precluded from contesting the reasonableness and regularity of the rates

---

[1]Featherly later agreed to dismiss his declaratory judgment action against Huguley with prejudice.

charged for its emergency room services given his use of the full charges to negotiate the settlement agreement in the underlying personal injury lawsuit.

On February 21, 2017, the Hospital filed a counterclaim for the full $24,682.00 charged for its services, asserting breach of contract and unjust enrichment as theories of liability. The Hospital again cited Featherly's reliance on that amount as the basis for his personal injury cause of action and the foundation of the amount he eventually obtained in settlement thereof. Featherly thereafter filed a general denial and further specifically pleaded that, due to his injuries, he lacked the capacity to execute the contract for services with the Hospital and that the Hospital committed fraud in charging for its services.

On July 6, 2018, the Hospital amended its counterclaim to add the theories of quantum meruit and money had and received. Featherly responded with an amended answer asserting that the Hospital's unclean hands foreclosed any recovery under the Hospital's equitable theories of recovery. On November 2, 2018, the Hospital amended its counterclaim to assert that, even if Featherly had initially lacked the capacity to execute the admission acknowledgment and consent form, he subsequently ratified the contract by adopting the full amount billed therefor as the basis for the litigation and settlement of his personal injury cause of action against Applebaum.

Called to trial on November 12, 2018, the parties submitted their proposed jury questions and instructions and agreed to reserve their claims for attorney's fees for adjudication by the court post-verdict. Before and during trial, the Hospital sought to

prove its ratification defense by offering a demand letter, the discovery responses, the settlement agreement, the joint motion to dismiss, and the order of dismissal with prejudice in the underlying negligence action against Applebaum. The Hospital argued that in each of these documents, Featherly ratified the contract for hospital services by urging $24,682.00 as the reasonable and necessary amount he incurred for those services as compensable damages resulting from Applebaum's negligence. The trial court excluded each of these exhibits as irrelevant.

The trial court submitted its charge to the jury. As an initial matter, and separate and distinct from the subsequent liability questions, the court's charge asked the following question concerning the validity of the Hospital's lien: "What was a 'reasonable and regular rate' for the hospital services provided to [Featherly] by [the Hospital] on March 13, 2014[?]" The charge then conditioned the breach of contract liability and damages questions upon a negative answer to a question asking whether Featherly lacked the mental capacity to contract for the hospital care he received—effectively an affirmative finding of mental incapacity. The trial court refused to submit ratification as an alternative basis for contract formation in the event of an affirmative incapacity answer.[2] The charge did, however, submit a liability question with instruction and a damages question on the Hospital's quantum meruit theory of recovery.

---

[2] The Hospital tendered the following question and instruction on ratification:

Did Plaintiff ratify an agreement with Defendant to pay the "full billed charges" for the goods and services provided to him during his admission

9

Addressing the validity of the hospital lien, the jury eventually found that the reasonable and regular rate for the Hospital's services to Featherly was $13,575.10, the exact amount originally calculated by the Hospital applying its uninsured discount. The jury also found that, due to Featherly's injuries in the wreck, he lacked the mental capacity to contract when he signed the admission acknowledgment and consent form at the Hospital. Because this negative response foreclosed any consideration of the Hospital's breach of contract theory of recovery, the jury did not answer those questions. Nevertheless, on the Hospital's alternative quantum meruit theory of recovery, the jury found that the Hospital had rendered compensable services to Featherly for which it was entitled to compensation in the amount of $13,575.10.[3]

---

to Defendant's emergency department and to "irrevocably assign" to Defendant his interest in a recovery from a third-party liability policy up to the amount of Defendant's charges?

A person ratifies an agreement if he recognizes the validity of the agreement by acting or performing under the agreement or by otherwise affirmatively acknowledging the agreement. In other words, if a person by his conduct recognizes an agreement as valid, having knowledge of all relevant facts, he ratifies the agreement. Any act inconsistent with an intent to avoid being bound by an agreement has the effect of ratifying the agreement.

[3]The charge instructed the jury to "proceed" to consider and answer the quantum meruit questions if it found Featherly lacked the requisite mental capacity to contract, but later instructed the jurors to answer the quantum meruit questions only if they previously found Featherly had the mental capacity to contract but did not actually agree to a contract with the Hospital. The jury apparently followed the first instruction and ignored the second in answering the quantum meruit questions.

After trial, the parties submitted competing motions for judgment, including briefing and affidavits on their respective attorney's fees, with Featherly urging the trial court to disregard the jury's quantum meruit findings because the finding of mental incapacity conclusively negated any finding that he "accepted, used and benefited from" the Hospital's services or that he was "reasonably notified" that the Hospital expected to be compensated for its services. On May 10, 2019, the trial court entered a Final Judgment granting Featherly declaratory judgment relief in the following particulars:

> The lien filed on May 9, 2014 by Texas Health Harris Methodist Hospital Fort Worth for the hospital's charges for services provided to Plaintiff on March 13, 2014 alleged the amount of $24,682.00 due, but is invalid as to the amount of $11,106.90. This amount was found by the jury to exceed a reasonable and regular rate for the hospital services provided to Plaintiff by Defendant on March 13, 2014. The lien is valid for the remaining $13,575.10, the amount determined by the jury to be a reasonable and regular rate for the hospital services provided to Plaintiff by Defendant on March 13, 2014.

The trial court awarded Featherly $88,715.01 in attorney's fees on his declaratory judgment claim. But the trial court disregarded the jury's verdict on the Hospital's quantum meruit theory of recovery and rendered a take-nothing judgment against the Hospital on each of its counterclaims. In so doing, the Final Judgment paradoxically declared the validity of the Hospital's lien in the amount of $13,575.10 but invalidated the underlying debt secured by the lien. *See Linnstaedter*, 226 S.W.3d at 411 ("A lien is part and parcel of the underlying claim, the former existing only because of the latter.").

The Hospital subsequently appealed, and Featherly cross-appealed.

## II. FEATHERLY'S CROSS-APPEAL[4]

In his sole issue, Featherly complains of the trial court's declaration that the Hospital's statutory lien is valid in the amount of $13,575.10. He contends that the entirety of the lien should have been declared invalid—despite the jury's finding that this amount represents the reasonable and regular rate for the hospital services rendered to him—because he was never "admitted" as an inpatient to the Hospital as required by Section 55.002(a) of the Texas Property Code, which provides,

> A hospital has a lien on a cause of action or claim of an individual who receives hospital services for injuries caused by an accident that is attributed to the negligence of another person. For the lien to attach, the individual must be *admitted* to a hospital not later than 72 hours after the accident.

Tex. Prop. Code Ann. § 55.002(a) (emphasis added). Featherly reasons that since he only received treatment in the Hospital's emergency room and was never formally "admitted" to the Hospital for "inpatient" treatment, the treatment he received was "outpatient" in nature and, therefore, not subject to a statutory lien.[5]

---

[4]We address Featherly's cross-appeal first because the error of which he complains is a matter of statutory construction that presents the only circumstances for rendition of judgment as a matter of law. "Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief." *Bradleys' Elec., Inc. v. Cigna Lloyds Ins.*, 995 S.W.2d 675, 677 (Tex. 1999).

[5]The first acknowledgment on the consent form signed by Featherly upon his arrival at the Hospital provided, "I understand that my health condition requires inpatient or outpatient admission." Although the Hospital's form contemplates the

12

The authority he offers for this interpretation of the word "admitted" is an online Medicare FAQ.[6] The FAQ explains that for purposes of Medicare, a patient is admitted to the hospital only when there is a doctor's order to admit the patient to the hospital and treat him on an inpatient basis.

Moreover, Featherly notes that the Legislature subsequently amended the hospital lien statute in 2019 to define the term "admitted" to include treatment in an emergency medical services department, to wit, "For purposes of this chapter, an injured individual is considered admitted to a hospital if the individual is allowed access to any department of the hospital for the provision of any treatment, care, or service to the individual." Tex. Prop. Code Ann. § 55.0015. Featherly argues that if, prior to 2019, the term "admitted" had already embraced outpatient treatment of the kind he received in the Hospital, there would have been no need for the Legislature to clarify that fact with a new enactment.

By way of response, the Hospital urges us to interpret the term "admitted" consistent with its plain meaning, which coincides with the interpretation endorsed by Section 55.0015, i.e., that an individual is "admitted" if he is allowed access to a hospital or one of its departments—including its emergency medical services department—to

---

admission of a patient for both inpatient and outpatient treatment, Featherly's signed acknowledgment is not dispositive of the issue he presents for our review.

[6]*See* https://www.medicare.gov/sites/default/files/2018-09/11435-Are-You-an-Inpatient-or-Outpatient.pdf (revised Aug. 2018) (last visited Apr. 7, 2022).

receive treatment. The Hospital maintains that because Featherly was allowed access to and was treated in the Hospital's emergency room, he was indeed "admitted" to the Hospital for purposes of Section 55.002(a), even if he did not receive inpatient treatment.[7]

---

[7]It should be noted that Featherly never formally pleaded for a declaration that the word "admitted" in Section 55.002(a) required inpatient treatment to the exclusion of outpatient and emergency room treatment. And while his timely motion for judgment notwithstanding the verdict urged the trial court to disregard the jury's verdict and to declare the Hospital's statutory lien invalid in its entirety, the only mention of this interpretation of Section 55.002(a) as a basis for JNOV occurred in a supplemental brief he filed on May 9, 2019, well after the February 8, 2019 hearing on post-verdict motions and the day before the trial court signed the Final Judgment: "This Court should enter a declaration that [the Hospital]'s lien in this case is invalid and void and of no effect because . . . it was undisputed at trial that Stephen Featherly was not admitted to the hospital[.]"

Although counsel for Featherly had urged this interpretation verbally during the February 8 hearing, he readily acknowledged the absence of any supporting caselaw for his interpretation. And although not couched or ruled upon as an objection, counsel for the Hospital informed the trial court during that hearing that this was the first time Featherly raised the issue and there was no pleading to support it. Counsel for Featherly subsequently verbally objected on this basis to the Final Judgment at the hearing on May 10, 2019, but again referenced no pleading or interpretive caselaw to support the declaration sought.

With no reference to any pleading wherein Featherly had sought this declaration, the single sentence in his belated supplemental brief is the sole basis for concluding that the trial court considered and rejected this interpretation of Section 55.002(a) for purposes of declaratory relief. *See* Tex. R. App. P. 33.1(a)(1) (requiring, for purposes of preserving appellate review, a complaint made to the trial court by motion to have "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint"). Nevertheless, for purposes of his cross-appeal, we will assume without deciding that Featherly has preserved this complaint and address its merits. *Cf. Dall. Cnty. Hosp. Dist. v. Sosa*, No. 05-19-01164-CV, 2020 WL 4581666, at *7 n.9 (Tex. App.—Dallas Aug. 10, 2020, pet. denied) (mem. op.) ("[W]e need not address [the] arguments that . . . Sosa's pleadings

14

## A.      Standard of Review

Statutory construction is a question of law subject to appellate review de novo. *See Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 131 (Tex. 2018). "In construing statutes, our primary objective is to give effect to the Legislature's intent." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

"[W]ords and phrases are read in context and construed according to the rules of grammar and common usage." *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010) (op. on reh'g) (citing Tex. Gov't Code Ann. § 311.011(a)). "Words that are not defined are given their ordinary meaning unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results." *Id.* "To determine a statutory term's common, ordinary meaning, we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage and Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017).

"Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Tex. Gov't Code Ann. § 311.011(b). For example, "when a term unknown to the law has a particular or technical meaning as applied to some art, science or trade, the court will look to the particular craft in order to ascertain its proper significance." *State v. Kaiser*,

---

negate his assertion that he was not admitted to [the hospital] because those pleadings allege Sosa was seen in [the hospital]'s emergency department[.]").

822 S.W.2d 697, 700 (Tex. App.—Fort Worth 1991, pet. ref'd) (op. on reh'g); *Lloyd A. Fry Roofing Co. v. State*, 541 S.W.2d 639, 642 (Tex. App.—Dallas 1976, writ ref'd n.r.e.) (same). When the art, science, or trade involves the practice of medicine, we may consider how medical dictionaries define a particular term of art. *See Tex. State Bd. of Exam'rs*, 511 S.W.3d at 35 & n.14.

Finally, even if the statute is not ambiguous, we may consider its object, the circumstances of its enactment, its legislative history, and any former statutory provisions, whether discarded, amended, codified, or otherwise preserved. *See* Tex. Gov't Code Ann. § 311.023(1)–(4); *see also Pruski v. Garcia*, 594 S.W.3d 322, 328 & n.2 (Tex. 2020) (recognizing how an enacted statute may change over time, i.e., the history of legislation as opposed to legislative history, and how such "variations lend helpful interpretive context" (quoting *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 445 n.31 (Tex. 2011) (Willett, J., concurring in part))). Ultimately, we "must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008).

### B. Hospital Liens Secure Payment for Post-Accident Hospital Treatment

Originally enacted in 1933,[8] and thereafter codified in 1983,[9] the hospital lien statute provides hospitals an additional method of securing payment from accident victims, thereby encouraging their prompt and adequate treatment. *In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 131 (Tex. 2018) (orig. proceeding); *McAllen Hosps.,*

---

[8]*See* Act of Apr. 19, 1933, 43rd Leg., R.S., ch. 85, §§ 1–5, 1933 Tex. Gen. Laws 182, 182–85 (Tex. Rev. Civ. Stat. Ann. art. 5506a) (repealed) (hereinafter "former Article 5506a"). As originally enacted, former Article 5506a authorized the attachment of a lien as security for payment in the following manner:

> Every association, individual, corporation, or other institution maintaining *a hospital or clinic rendering hospital services* in the State of Texas *shall be entitled to a lien upon any and all rights of action*, suits, claims, counter-claims, or demands *of any persons admitted to any such hospital and receiving treatment, care, and maintenance therein, on account of any personal injuries received in any accident as the result of the alleged negligence of any other person* or firm or corporation or joint stock association, his, its, or their agent, servant or employee, which any such person may or shall have, assert, or maintain against any such other person or firm or corporation or joint stock association for damages on account of such injuries, *for the amount of the charges of such hospital or clinic for such treatment, care and maintenance* as may have been given to the injured persons. *Provided the lien provided for herein shall not exist or attach unless the injured person is received in such hospital within seventy-two (72) hours after the happening of the accident causing the injury.*

*See id.* at § 1 (emphasis added). Although alluding to a person's being both "admitted to any such hospital" and "received in such hospital" when referencing the creation and attachment of a lien, respectively, former Article 5506a, Section 1 nevertheless defined neither "admitted" nor "received" as statutory terms of art. *Id.*

[9]*See* Act of May 26, 1983, 68th Leg., R.S., ch. 576, § 1, 1983 Tex. Gen. Laws 3475, 3561–65 (codified as Chapter 55 of the Texas Property Code) (hereinafter "1983 codification"). "[N]o substantive change in the law [was] intended by this [codification]." *Id.* § 7.

17

*L.P. v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 433 S.W.3d 535, 537 (Tex. 2014); *Linnstaedter*, 226 S.W.3d at 411; *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 309 (Tex. 1985); *Speegle v. Harris Methodist Health Sys.*, 303 S.W.3d 32, 35–36 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam) (op. on reh'g). "The purpose of the act was to encourage hospitals to provide immediate care and treatment to persons injured in accidents[] and to compensate hospitals for the vast sums of money being lost when treating patients who were unable to pay." *Members Mut. Ins. v. Hermann Hosp.*, 664 S.W.2d 325, 326 (Tex. 1984). Accordingly, "the statute 'is replete with language that the hospital recover the full amount of its lien, subject only to the right to question the reasonableness of the charges comprising the lien.'" *N. Cypress*, 559 S.W.3d at 131 (quoting *Bashara*, 685 S.W.2d at 309).

"Subject to certain conditions, a hospital has a lien on the cause of action of a patient who receives hospital services for injuries caused by an accident that is attributed to the negligence of another person." *Id.* (internal quotation omitted); *see* Tex. Prop. Code Ann. § 55.003(a)(1). "The lien also attaches to the proceeds of a settlement of the patient's cause of action." *N. Cypress*, 559 S.W.3d at 131 (citing Tex. Prop. Code Ann. § 55.003(a)(3)). Finally, the lien attaches to any judgment awarding damages for the patient's personal injury or wrongful death if arising from an injury for which the patient is admitted to the hospital or receives emergency medical services. *See* Tex. Prop. Code Ann. § 55.003(a)(2).

As observed by the supreme court in *Linnstaedter*,

A lien is part and parcel of the underlying claim, the former existing only because of the latter. As a chose in action is the intangible personal property of the claimant, a lien against such property is necessarily a claim against its owner. Moreover, as a hospital has neither tort nor contract rights against a tortfeasor who has injured a patient, the only support for a hospital lien is its claim for reimbursement from the patient. Thus, a lien against a patient's tort recovery is just as much a claim against the patient as if it were filed against the patient's house, car, or bank account.

226 S.W.3d at 411 (footnotes omitted).

Nevertheless, for a valid lien to attach, the injured patient must have been "admitted to a hospital" for the treatment made the subject of the lien not later than 72 hours after the underlying accident. Tex. Prop. Code Ann. § 55.002(a).

**C. According to the Plain Meaning of the Term, Featherly was "Admitted" to the Hospital**

In his sole issue, Featherly contends that the Hospital is not entitled to a lien because he was never "admitted" to the Hospital. *See id.* As Featherly notes, he was treated in the Hospital's emergency room and left the Hospital just three hours later, and he did not stay overnight or receive inpatient treatment. In Featherly's view, inpatient treatment is a necessary precondition to qualify as being "admitted" to a hospital. Featherly urges us to adopt a technical, medical interpretation of the word "admitted," in which "admitted" is a term of art that essentially means treatment at a hospital on an inpatient basis. To support this position, Featherly relies on contemporary sources that treat "admitted" as a term of art implying treatment on an inpatient basis.

19

We do not dispute that modern sources such as contemporary medical dictionaries and Medicare regulations use the term "admitted" in such a fashion. For example, contemporary medical dictionaries refer to inpatient care, as distinguished from outpatient care, when defining the term "admit." *See, e.g., Admit*, Merriam-Webster Medical Dictionary 15 (2016) ("to accept into a medical facility (as a hospital) as an inpatient"); *Inpatient, id.* at 381 ("a hospital patient who receives lodging and food as well as treatment"); *Outpatient, id.* at 555 ("a patient who is not hospitalized overnight but who visits a hospital, clinic, or associated facility for diagnosis or treatment"). *But see Hospitalize, id.* at 343 ("to place in a hospital as a patient").

Likewise, the current Medicare regime also defines "admitted" as a term of art that connotes inpatient care. Enacted in 1965,[10] Medicare provides health insurance for the elderly and disabled, as administered by the United States Department of Health & Human Services through the Center for Medicare & Medicaid Services. *Alvarado Hosp., L.L.C. v. Price*, 868 F.3d 983, 987 (Fed. Cir. 2017) (citing 42 U.S.C.A. §§ 1395–1395*lll*). "Medicare Part A covers hospital inpatient services and Medicare Part B covers outpatient services, including emergency room services for patients who do not require a hospital admission." *Id.* At a minimum, therefore, Medicare reimbursement eligibility

---

[10] *See* Health Insurance for the Aged Act, Pub. L. No. 89–97, tit. I, 79 Stat. 286 (1965).

appears to make a distinction between inpatient and outpatient care as applied to emergency room services.[11]

But critically, to determine the meaning of a statute, "we must consider the term's original public meaning, that is, 'the meaning which it had when [the statute was] enacted.'" *VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 369 (Tex. 2020) (quoting *Taylor v. Firemen's & Policemen's Civ. Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981)). The Legislature enacted the hospital lien statute over three decades before Congress enacted Medicare, and well before the issuance of contemporary dictionaries. We therefore cannot retrospectively imbue the word "admitted" with the inpatient/outpatient distinction used by Medicare and some modern medical authorities.

Rather, our focus is on the term's historical meaning, and the relevant historical authorities strongly suggest that the development of the word "admitted" into a medical term of art occurred well after the original enactment of the hospital lien statute. Historical medical dictionaries show that when the hospital lien statute was enacted, the term "admitted" was not used as a term of art that implied inpatient treatment. At the time, medical dictionaries had never considered "admit," "admitted," or "admission"

---

[11]Whether the reimbursement is for inpatient or outpatient emergency room services, the charges subject to reimbursement are only those that are "reasonable and necessary." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017) (quoting 42 U.S.C.A. § 1395y(a)(1)(A)).

to be terms of art in need of a unique medical definition.[12] The earliest reference to the admission of a patient to a hospital appears in the seventh edition of Dunglison's Medical Dictionary, published in 1848: "An establishment for the reception of the sick, in which they are maintained and treated medically. . . . They may be general, receiving all cases; or special, *admitting* only the subjects of certain diseases." *Compare Hospital*, Dunglison's Medical Dictionary 428–29 (7th ed. 1848) (cleaned up) (emphasis added), *with Hospital*, Dunglison's Medical Dictionary 363 (6th ed. 1846) ("An establishment for the reception of the sick, in which they are maintained and treated medically."). And its definition of "hospital" clearly equates "admitting" with "receiving" a patient on any basis, as does the language of former Article 5506a.

In a similar vein, the third edition of Black's Law Dictionary, which was published the same year as the enactment of former Article 5506a, defined "hospital" by reference to the reception of patients, but not their admission. *Hospital*, Black's Law Dictionary 904 (3d ed. 1933) ("An institution for the reception and care of sick,

---

[12]*See* Gould's Medical Dictionary 36 (4th rev. ed. 1935); Dorland's Medical Dictionary 45 (14th ed. 1927); Dorland's Pocket Medical Dictionary 20 (12th ed. 1922); Stedman's Medical Dictionary 20–21 (7th ed. 1922); Stedman's Medical Dictionary 20–21 (6th ed. 1920); Dorland's Medical Dictionary 40 (10th ed. 1919); Stedman's Medical Dictionary 20 (5th ed. 1918); Gould's Medical Dictionary 26 (3d ed. 1916); Appleton's Medical Dictionary 22 (1916); Lippincott's Medical Dictionary 22 (2d ed. 1911); Gould's Medical Dictionary 30 (2d ed. 1910); Gould's Medical Dictionary 30 (1907); Lippincott's Medical Dictionary 22 (rev. ed. 1905); Dunglison's Medical Dictionary 23 (23d ed. 1903); Gould's Pocket Medical Dictionary 20 (1898); Lippincott's Pocket Medical Dictionary 14 (1897); Dunglison's Medical Dictionary 23 (21st ed. 1893); Dunglison's Medical Dictionary 26 (7th ed. 1848); Dunglison's Medical Dictionary 24 (6th ed. 1846).

wounded, infirm, or aged persons."). And consistent with this definition, the same dictionary defined "admit" as meaning "to suffer one to enter." *Admit*, Black's Law Dictionary 62 (3d ed. 1933). Both definitions were unchanged from those in the first edition published in 1891. *See Hospital*, Black's Law Dictionary 581 (1891); *Admit*, *id.* at 41.

As to the inpatient/outpatient distinction urged by Featherly, "inpatient" was not a recognized medical term of art before the enactment of former Article 5506a.[13] Conversely, "outpatient" had long been a medical term of art, the usage of which usually contemplated some form of treatment provided at a hospital, but without the need for

---

[13]*See* Gould's Medical Dictionary 661 (4th rev. ed. 1935); Dorland's Medical Dictionary 591 (14th ed. 1927); Dorland's Pocket Medical Dictionary 323 (12th ed. 1922); Stedman's Medical Dictionary 498 (7th ed. 1922); Stedman's Medical Dictionary 498 (6th ed. 1920); Stedman's Medical Dictionary 489 (5th ed. 1918); Gould's Medical Dictionary 26 (3d ed. 1916); Gould's Medical Dictionary 464 (3d ed. 1916); Appleton's Medical Dictionary 451 (1916); Lippincott's Medical Dictionary 458 (2d ed. 1911); Gould's Medical Dictionary 514 (2d ed. 1910); Gould's Medical Dictionary 514 (1907); Lippincott's Medical Dictionary 519 (rev. ed. 1905); Dunglison's Medical Dictionary 579 (23d ed. 1903) (Thomas L. Stedman, A.M., M.D., editor); Lippincott's Pocket Medical Dictionary 188 (1897); Dunglison's Medical Dictionary 583 (21st ed. 1893).

room and board.[14] Usually, such treatment occurred in a hospital dispensary,[15] as opposed to a ward.[16] Indeed, the County Hospital Act of 1913 authorized "out-patient" hospital services consistent with these definitions, thereby demonstrating the Legislature's awareness of their usage at the time of its enactment of former Article

---

[14] *See Outpatient*, Gould's Medical Dictionary 1038 (4th rev. ed. 1935) ("A hospital patient who is not treated in the wards of the institution."); *Outpatient*, Dorland's Medical Dictionary 846 (14th ed. 1927) ("A hospital patient not treated within the wards."); *Outpatient*, Dorland's Pocket Medical Dictionary 463 (12th ed. 1922) (same); *Outpatient*, Stedman's Medical Dictionary 460 (7th ed. 1922) ("A patient treated at a hospital dispensary and not in the wards of the institution."); *Outpatient*, Stedman's Medical Dictionary 718 (6th ed. 1920) (same); *Outpatient*, Stedman's Medical Dictionary 705 (5th ed. 1918) (same); *Outpatient*, Gould's Medical Dictionary 640 (3d ed. 1916) (same); *Outpatient*, Appleton's Medical Dictionary 618 (1916) ("A patient who receives treatment at a hospital without being an inmate of it."); *Outpatient*, Lippincott's Medical Dictionary 669 (2d ed. 1911) ("A patient of a hospital not treated within its walls."); *Outpatient*, Gould's Medical Dictionary 718 (2d ed. 1910) (same); *Outpatient*, Gould's Medical Dictionary 718 (1907) (same); *Outpatient*, Lippincott's Medical Dictionary 726 (rev. ed. 1905) (same); *Outpatient*, Dunglison's Medical Dictionary 811 (23d ed. 1903) ("A dispensary patient; one treated in a hospital or dispensary while living at home."); *Outpatient*, Lippincott's Pocket Medical Dictionary 285 (1897) (same).

[15] *See Dispensary*, Stedman's Medical Dictionary 286 (7th ed. 1922) ("An out-patient department of a hospital[.]"); *Dispensary*, Stedman's Medical Dictionary 286 (6th ed. 1920) (same); *Dispensary*, Stedman's Medical Dictionary 281 (5th ed. 1918) (same).

[16] *See Ward*, Dorland's Medical Dictionary 1326 (14th ed. 1927) ("A large room in a hospital."); *Ward*, Stedman's Medical Dictionary 1110 (7th ed. 1922) ("A room or hall in a hospital containing a number of beds."); *Ward*, Stedman's Medical Dictionary 1110 (6th ed. 1920) (same); *Ward*, Stedman's Medical Dictionary 1092 (5th ed. 1918) (same); *Ward*, Gould's Medical Dictionary 945 (3d ed. 1916) ("A division or room of a hospital."); *Ward*, Lippincott's Pocket Medical Dictionary 399 (1897) ("One of the apartments of a hospital.").

5506a.[17] And these definitions are consistent with contemporary medical definitions. *See, e.g.*, *Outpatient*, Stedman's Medical Dictionary 1396 (28th ed. 2006) ("A patient treated in a hospital dispensary or clinic instead of in an overnight room or ward.").

In sum, the state of the language, as reflected in medical dictionaries of the time, shows that when the hospital lien statute was enacted, the word "admitted" was not used as the term of art it has since become. Nor was it a reference to "inpatient" treatment—a coinage that did not yet exist. Nor did it exclude well-defined "outpatient" treatment from the statute's application.

If a term of art was not intended, we resort to plainer methods of construction. *See Marks*, 319 S.W.3d at 663. "To determine a term's common, ordinary meaning, we typically look first to dictionary definitions." *Rodriguez*, 547 S.W.3d at 838. Thus, our square one is a dictionary dated to the era of the statute's enactment, which defines "admit" as "to allow to enter, let in, receive." *Admit*, The Shorter Oxford English Dictionary 25 (3d ed. 1933). Likewise, a dictionary printed around the time that the statute was codified defines "admit" as "to allow to enter." *Admit*, Webster's II New Riverside Dictionary 10 (1984). The facts of this case neatly fit these definitions. Featherly's own evidence proved that he was allowed entry to the Hospital's emergency

---

[17]The Act authorized hospital services that (1) included an outpatient department and free dispensary and clinic, (2) treated the admission of a patient to the hospital synonymously with a patient's reception into the hospital, and (3) made "the urgency of need of treatment" a criterion for the reception and admission of patients. *See* Act of Mar. 1, 1913, 33rd Leg., R.S., ch. 39, §§ 1–17, 1913 Tex. Gen. Laws 71, 71–78 (Tex. Rev. Civ. Stat. Ann. arts. 4478–94) (repealed).

room for treatment, and it is undisputed that the emergency room is part of the Hospital. According to the original public meaning of the term, then, Featherly was "admitted" to the Hospital. *See VIA Metro.*, 620 S.W.3d at 369.

We find confirmation of this interpretation in the history of the legislation itself. *See Pruski*, 594 S.W.3d at 328 & n.2. First, as previously observed, the original legislation alluded to being "admitted to any such hospital" and being "received in such hospital" as phrases of similar effect when referencing the creation and attachment of a lien. *See* former Article 5506a, § 1. The original version of the statute thus arguably drew a parallel between being admitted to a hospital and being received at a hospital for treatment; there is no language contemplating an inpatient/outpatient distinction. *See id.* The 1953 amendments to the statute similarly treated the phrases "admitted to any hospital" and "received in a hospital" as synonymous,[18] and the Legislature left those phrases unchanged through the enactment of Medicare and the repeal and codification of the statute in 1983.[19]

Second, the original version of the statute applied equally to charges incurred for hospital services provided after admission to both hospitals *and clinics*, the latter of

---

[18]*See* Act of May 6, 1953, 53rd Leg., R.S., ch. 131, §§ 1–4, 1953 Tex. Gen. Laws 443, 443–45 (hereinafter "1953 amendments").

[19]*See* 1983 codification, at § 7 ("[N]o substantive change in the law is intended by this [codification]."); Act of May 31, 1981, 67th Leg., R.S., ch. 359, §§ 1–3, 1981 Tex. Gen. Laws 953, 953–54 (hereinafter "Medicare amendment"); Act of May 18, 1979, 66th Leg., R.S., ch. 509, §§ 1–2, 1979 Tex. Gen. Laws 1080, 1080; Act of May 29, 1971, 62nd Leg., R.S., ch. 769, §§ 1–2, 1971 Tex. Gen. Laws 2420, 2420–21.

which, by definition,[20] provided exclusively outpatient treatment. *See* former Article 5506a, §§ 1, 3–5. Section 1 measured the amount of the lien by "the amount of the charges of such hospital *or clinic* for such treatment, care and maintenance as may have been given to the injured persons." *Id.* (emphasis added). And Sections 3, 4, and 5 referred to clinics as distinct entities from hospitals and other institutions whose charges are eligible for the lien. *Id.* And the statute continued to recognize clinics as distinct providers of lien-eligible hospital services through codification, *see* notes 17 & 18 *supra*, when the Legislature subsumed them into the definition of "hospital" as "a person or institution maintaining a facility that provides hospital services in this state." *See* 1983 codification, at 3562 (codified at Tex. Prop. Code Ann. § 55.001(3)).

Third, the emergency enactment provision of former Article 5506a plainly contemplated that the hospital services subject to a lien included emergency medical treatment:

> *The fact that it is necessary for persons injured in accidents to be taken immediately to hospitals and to receive care and treatment for their injuries and to be maintained during such care and treatment without giving the hospitals, clinics and institutions an opportunity to investigate the financial worth of the injured party, and that the hospitals of the State of Texas are losing vast sums of money which amounts to the taking of property without compensation therefor,* creates an emergency and an imperative public necessity that the Constitutional Rule which requires bills to be read on three several days be suspended and said Constitutional Rule is hereby

---

[20] *See Clinic*, Stedman's Medical Dictionary 208 (7th ed. 1922) ("An institution in which medical attention is given to patients who live at home, not requiring hospital care."); *Clinic*, Stedman's Medical Dictionary 208 (6th ed. 1920) (same); *Clinic*, Stedman's Medical Dictionary 205 (5th ed. 1918) (same).

suspended, and this Act shall take effect and be in full force from and after its passage, and it is so enacted.

*See* former Article 5506a, § 5 (emphasis added); *see also* Tex Gov't Code Ann. § 311.023(7) (authorizing consideration of emergency enactment provision to discern legislative intent). *See generally Baylor Univ. Med. Ctr. v. Travelers Ins.*, 587 S.W.2d 501, 503–04 (Tex. App.—Dallas 1979, writ ref'd n.r.e.) (considering the emergency enactment provisions in the original 1933 hospital lien statute and its 1953 amendments). Twenty years later, the 1953 amendments employed virtually the same emergency enactment language:

> The fact that it is necessary for persons injured in accidents to be taken immediately to hospitals to receive care and treatment for their injuries and to be maintained during such care and treatment . . . create[s] an emergency and an imperative public necessity . . . .

*See* 1953 amendments, at § 4. In both instances, the phrase "taken immediately to hospitals" anticipates emergency room treatment.[21]

And at least one pre-Medicare decision considered charges for emergency room treatment to fall within the scope of statutory hospital liens. In *City of Houston v. Bullard*, our sister court in Houston addressed the validity of a hospital lien arising because the

---

[21]Although we have been unable to find a single decision of this or any other Texas court antedating the enactment of former Article 5506a that refers to treatment received in an "emergency room" setting as either including or excluding hospital admission, at least one court observed, "[I]t is a matter of common knowledge, and to their credit, that most hospitals are charitably equipped in these hazardous times . . . with facilities for caring for patients in emergencies of this sort, . . . without advanced or secured payment." *Willacy Cnty. v. Valley Baptist Hosp.*, 29 S.W.2d 456, 457–58 (Tex. App.—San Antonio 1930, no writ).

patients "were admitted for emergency treatment" for injuries sustained in a motor vehicle accident from which they were taken directly to the hospital. 354 S.W.2d 224, 227 (Tex. App.—Houston 1962, no writ). This phrasing confirms that prior to the enactment of Medicare, emergency room treatment was fully consistent with the statute's use of the word "admitted." *See id.*; *see also Dill v. Holt's Sporting Goods Store*, 323 S.W.2d 644, 646 (Tex. App.—Houston 1959, no writ) ("The hospital record which was introduced in evidence shows that Mrs. Dill was admitted to the emergency room of the hospital at 10:30 a.m. and that the time of the accident was approximately 10 a.m.").

Fourth, the Legislature eventually confirmed *Bullard*'s understanding of the term "admitted" in 2001, by amending the statute to include "emergency hospital care" within those services subject to a lien:

> The lien may also include the amount of a physician's reasonable and necessary charges for *emergency hospital care services* provided to the injured individual during the first seven days of the injured individual's hospitalization. At the request of the physician, the hospital may act on the physician's behalf in securing and discharging the lien.

*See* Act of May 24, 2001, 77th Leg., R.S., ch. 930, § 1, 2001 Tex. Gen. Laws 1867, 1868 (Tex. Prop. Code Ann. § 55.004(c)) (hereinafter "2001 amendment") (emphasis added). The Legislature defined "emergency hospital care" to mean

> health care services provided in a hospital to evaluate, stabilize, and treat a serious medical problem of recent onset or severity, including severe pain that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that the condition, illness, or injury is of such a nature that failure to obtain immediate medical care would in all reasonable probability: (1) seriously jeopardize the patient's health; (2) seriously impair one or more bodily functions; (3) seriously harm an

29

organ or other part of the body; (4) cause serious disfigurement; or (5) in the case of a pregnant woman, seriously jeopardize the health of the fetus.

*See* Tex. Prop. Code Ann. § 55.004(a).

Critically, this definition substantially tracks the definition of "emergency medical care" in the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C.A. § 1395dd, which establishes medical screening requirements for individuals presenting themselves "for examination or treatment" *to hospital emergency departments. See Camp v. Harris Methodist Fort Worth Hosp.*, 983 S.W.2d 876, 880 (Tex. App.—Fort Worth 1998, no pet.) ("EMTALA defines an emergency medical condition as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain), such that the absence of immediate medical attention could reasonably be expected to result in (1) placing the health of the individual in serious jeopardy, (2) serious impairment to bodily functions, and (3) serious dysfunction of any bodily organ or part." (citing 42 U.S.C.A. § 1395dd(e)(1))); *see also Burditt v. U.S. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991) (observing that, under EMTALA, "active labor" is an emergency medical condition when "there is inadequate time to effect a transfer to another hospital prior to delivery" or "a transfer may pose a threat [to] the health and safety of the patient or the unborn child" (citing same)). To interpret the term "admitted" as requiring inpatient treatment, therefore, would lead to the absurd result of excluding charges for emergency room treatment obviously intended by the Legislature's use of EMTALA language. *See Molinet v. Kimbrell*, 356 S.W.3d 407,

411 (Tex. 2011) ("The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results."). Indeed, given the lien-eligibility of charges by "emergency medical services providers" such as EMTs, *see* Tex. Prop. Code Ann. § 55.002(c), Featherly's interpretation would lead to the nonsensical availability of statutory liens from the arrival of an ambulance at the scene of an accident through the 100th day of the patient's hospitalization but exclude any and all emergency hospital care services provided exclusively within the confines of the hospital's emergency room or department without subsequent hospitalization—a consequence undoubtedly not envisioned by the Legislature. *See In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 280 (Tex. 2016) (orig. proceeding) ("If the statute is unambiguous, we apply the words according to their common meaning, but we may consider the objective of the law and the consequences of a particular construction.").

Fifth and finally, although the current version of the hospital lien statute makes no mention of Medicare or its regulatory regime, a previous iteration expressly incorporated Medicare reimbursement limits, but did so in a manner that completely undermines the inpatient/outpatient interpretation urged by Featherly. In 1981, the Legislature amended the statute to provide that a lien "does not apply to the extent that charges for operating costs are in excess of the routine operating costs prescribed by 42 C.F.R., Section 405.460." *See* Medicare amendment, at § 1 (amending Section 3 of former Article 5506a). Significantly, the same proviso excluded "charges for *other services*

31

. . . in excess of a reasonable and regular rate." *See id.* (emphasis added). By making reasonable and regular charges for hospital services *other than those regulated by Medicare* subject to a lien, therefore, the Legislature did not intend the term "admitted" to exclude outpatient emergency hospital care services to the extent such "other services" were not eligible for Medicare reimbursement.[22]

Based upon this history of the legislation, the Legislature plainly intended to employ a simple, dictionary-grounded interpretation of the term "admitted" that encompassed inpatient, outpatient, and emergency hospital care services. To this end, it amended the statute to add the following definition in 2019: "For purposes of this chapter, an injured individual is considered admitted to a hospital if the individual is allowed access to any department of the hospital for the provision of any treatment, care, or service to the individual." Tex. Prop. Code Ann. § 55.0015. And the addition of Section 55.0015 was "intended to clarify rather than change the existing law." Act of May 22, 2019, 86th Leg., R.S., ch. 862, § 3, 2019 Tex. Gen. Laws 2329, 2330; *see Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex. 1996) ("When the meaning of an existing law is uncertain, the Legislature's later interpretation of it is

---

[22]The Legislature codified this proviso in 1983, *see* 1983 codification amendment, at 3563 (Tex. Prop. Code Ann. § 55.004 (repealed)), but removed its reference to Medicare reimbursement limitations altogether in 2001. *See* 2001 amendment. To the extent the Legislature ever intended to limit lien-eligibility to only those hospital services subject to Medicare reimbursement, such limitation no longer applies.

highly persuasive.").[23] The Legislature's clarification thus buttresses our conclusion that a patient may be "admitted" for purposes of the hospital lien statute even without inpatient treatment.

Based on the term's common meaning, we conclude that because Featherly was allowed entry and access to the Hospital's emergency room for treatment, Featherly was "admitted" to the Hospital for purposes of the hospital lien statute. Stated differently and tracking the language of the emergency enactment provision of former Article 5506a, Featherly was "taken immediately" to the Hospital "to receive care and treatment" for injuries sustained in a motor vehicle accident and received such care and treatment before the Hospital had "an opportunity to investigate" his "financial worth" including the viability of his negligence cause of action against Applebaum. His unilateral decision to forego further "emergency hospital care services" did not remove

---

[23]This rule of interpretation dates back more than a hundred and fifty years:

> There is a very well-established rule that where a later act implies a particular construction of an existing law, and particularly where the existing law is ambiguous or its meaning uncertain, interpretation of the prior act by the Legislature as contained in the later act is persuasive when a court is called upon to interpret the prior law.

*Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 475 n.11 (Tex. App.—Houston [1st Dist.] 2020, pet. dism'd) (op. on en banc reconsideration) (quoting *Stanford v. Butler*, 181 S.W.2d 269, 274 (Tex. 1944) (orig. proceeding), which in turn quoted *Cannon's Adm'r v. Vaughan*, 12 Tex. 399, 402 (1854), for a similar proposition). *But see Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 44 (Tex. 2020) (quoting *In re C.O.S.*, 988 S.W.2d 760, 764 (Tex. 1999)) (cautioning against fully ascribing a later legislature's intent to a previous legislature).

the charges he reasonably and necessarily incurred thereby from the application of the statute. We overrule Featherly's issue arguing to the contrary.

## III.   THE HOSPITAL'S APPEAL

### A.   Exclusion of Evidence

For the Hospital's appeal, we begin with its fourth point, in which the Hospital challenges the exclusion of evidence. Before trial, the Hospital amended its counterclaim to assert that, even if Featherly had initially lacked the capacity to execute the admission acknowledgment and consent form made the basis of its breach of contract claim, he subsequently ratified the contract by adopting the full amount billed therefor as the basis for the litigation and settlement of his personal injury cause of action against Applebaum. *See Elston v. Jasper*, 45 Tex. 409, 410–11 (1876) (holding that ratification must be affirmatively pleaded to avoid a mental incapacity defense to a breach of contract cause of action). Before and during trial, the Hospital sought to provide evidentiary support for its ratification defense by offering a pre-litigation demand letter, Featherly's discovery responses, the settlement agreement, the joint motion to dismiss, and the order of dismissal with prejudice in the underlying negligence action against Applebaum. The Hospital argued that, both singularly and cumulatively, these documents demonstrated that Featherly ratified the contract for hospital services by urging $24,682.00 as the reasonable and necessary amount he incurred for those services as compensable damages resulting from Applebaum's negligence. The trial court excluded each of these exhibits as irrelevant.

On appeal, the Hospital primarily asserts that Featherly's discovery responses were relevant to show that Featherly ratified the contract. According to the Hospital, the fact that Featherly quoted and adopted the exact amount billed under the contract is strong evidence that Featherly affirmed the contract's existence and validity, as well as the reasonableness and necessity of its charges, and the trial court therefore abused its discretion by excluding this evidence.

We review a trial court's exclusion of evidence for an abuse of discretion. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018). "A trial court abuses its discretion if it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable." *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 717 (Tex. 2020). "If a trial court abuses its discretion and erroneously excludes evidence, then the question is whether the error probably caused the rendition of an improper judgment." *JBS Carriers*, 564 S.W.3d at 836 (internal quotation omitted); *see* Tex. R. App. P. 44.1(a)(1). That standard does not require the complaining party to prove that but for the exclusion of evidence, a different judgment would necessarily have resulted. *JBS Carriers*, 564 S.W.3d at 836 (quoting *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (op. on reh'g)). Instead, the erroneous exclusion of evidence "crucial to a key issue" is likely harmful "unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Id.* (internal quotation omitted).

"To be admissible under the Texas Rules of Evidence, evidence must be relevant to the issues in the case." *Trencor, Inc. v. Cornech Mach. Co.*, 115 S.W.3d 145, 152 (Tex. App.—Fort Worth 2003, pet. denied) (citing Tex. R. Evid. 402). "Evidence is relevant if it has any tendency to make a fact of consequence to the action more or less probable than it would be without the evidence." *N. Cypress*, 559 S.W.3d at 131 (cleaned up) (quoting Tex. R. Evid. 401). The test for relevance is satisfied if there is directly, or by inference, some logical connection between the evidence and the fact to be proven. *Republic Waste Servs., Ltd. v. Martinez,* 335 S.W.3d 401, 406 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 601 n.3 (Tex. App.—Fort Worth 1995, writ denied)).

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *Concho Res., Inc. v. Ellison*, 627 S.W.3d 226, 234 (Tex. 2021). "The defense rests upon a manifestation of assent to confirm one's prior act or that of another." *Id.* (internal quotation omitted). "Ratification may be inferred by a party's course of conduct and need not be shown by express word or deed." *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 342–43 (Tex. App.—Fort Worth 2003, pet. denied). Ratification occurs when a party with full knowledge of the contract recognizes its validity, such as by acting or performing under the contract, affirmatively acknowledging the contract, or retaining benefits under the contract. *Verizon Corp. Servs. Corp. v. Kan-Pak Sys., Inc.*, 290 S.W.3d 899, 906 (Tex. App.—Amarillo 2009, no pet.);

36

*accord Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 329 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied); *Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 166 (Tex. App.—Tyler 2011, no pet.). "Once a party ratifies a contract, he may not later withdraw his ratification and seek to avoid the contract." *Mission Petro. Carriers, Inc. v. Kelley*, 449 S.W.3d 550, 553 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 506 (Tex. App.—San Antonio 2014, pet. denied), *judgm't vacated in part w.r.m.*, 2015 WL 1138309 (Tex. App.—San Antonio Mar. 11, 2015).

Specific to the contracts for "necessaries" provided to the mentally incompetent, Texas law has long recognized a common law claim for reasonable charges despite the individual's incapacity to contract. *See Ferguson v. Fitze*, 173 S.W. 500, 501 (Tex. App.—Galveston 1914, writ ref'd) ("Where the contract is for necessaries, and the consideration is performed, or where the contract is for legal services rendered to the party resting under disability, it seems that the reasonable value therefor may be recovered." (citing *Searcy v. Hunter*, 17 S.W. 372, 373 (Tex. 1891) ("For necessaries furnished an infant the law implies a contract. These are usually food, lodging, wearing apparel, medicine, medical attendance, and the means of an education. Such is the more rigid rule of the common law.")))). If the individual should subsequently regain his mental capacity, even temporarily, he may ratify this implied contract *post hoc* through declaration or conduct. *See Bolton v. Stewart*, 191 S.W.2d 798, 802 (Tex. App.—Fort Worth 1945, no writ) ("It is the universal rule in this state that contracts made by minors

and persons of unsound mind are not void but voidable only; they may be ratified if the party becomes competent to do so."). *See generally Insane and Incompetent Persons*, 24 Tex. Jur. § 8 ("Necessaries"), § 10 ("Ratification"), at 382–83 & 385–86 (1933).

In *Chandler v. Hendrick Memorial Hospital*, the Eastland Court of Appeals stated the common law rule thusly as applied to hospital services provided to a mentally incompetent patient:

> Where necessities are furnished to a person of unsound mind, the law imposes an obligation or agreement on his part to pay for them to the extent of the benefits received. "The doctrine that mental incapacity renders a contract voidable does not apply where the incompetent has been furnished with necessities. In such case the law creates an obligation to repay, to the extent of the reasonable value of the necessities." Medical services, including nursing and other usual services rendered a person of unsound mind, are necessities.

317 S.W.2d 248, 252 (Tex. App.—Eastland 1958, writ ref'd n.r.e.) (citations omitted) (misquoting 24 Tex. Jur. 382); *see also Chandler v. Warlick*, 321 S.W.2d 897, 901 (Tex. App.—Eastland 1958, writ ref'd n.r.e.) (same); *Chandler v. Prichard*, 321 S.W.2d 891, 895 (Tex. App.—Eastland 1958, writ ref'd n.r.e.) (same). Liability under such circumstances is "quasi-contractual rather than contractual" in nature. *Westbrook v. Adams*, 17 S.W.2d 116, 121 (Tex. App.—Fort Worth 1929) (quoting 1 Williston on Contracts, at 498 (1920)), *aff'd on other grounds by Adams v. Bankers' Life Co.*, 36 S.W.2d 182 (Tex. Comm'n App. 1931, holding approved).

For example, even if a hospital lien is not available, a hospital may seek payment for its services from a mentally incompetent patient based on quantum meruit. *See Dall.*

*Cnty. Hosp. Dist. v. Wiley ex rel. Wiley*, No. 05-01-01031-CV, 2002 WL 1286515, at *2–3 (Tex. App.—Dallas June 12, 2002, pet. denied) (op. on reh'g) (not designated for publication) (holding that patient's minority did not foreclose his liability for hospital services under quantum meruit cause of action). Indeed, the common law recognizes an implied contract for necessary hospital services even for mentally competent patients:

> Further, as a matter of law, we hold that when plaintiff entered the hospital and received its services, there was created an implied contract to pay for same, and he was liable therefor until he or someone else paid the bill. The fact that his action created a derivative obligation on the part of one or more third parties to pay the hospital, or to reimburse him, did not affect his obligation under the implied contract between him and the hospital. If these derivative obligors had failed to pay, the hospital would have had a legal claim against plaintiff.

*Black v. Am. Bankers Ins.*, 478 S.W.2d 434, 437–38 (Tex. 1972) (citing *Republic Bankers Life Ins. v. Anglin*, 433 S.W.2d 795, 796 (Tex. App.—Texarkana 1968, no writ) ("Mr. Anglin's entry into the hospital and reception of its services created an implied agreement between the two that Mr. Anglin would pay the reasonable and customary charges made by the hospital."), and *Am. Indem. Co. v. Olesijuk*, 353 S.W.2d 71, 72 (Tex. App.—San Antonio 1961, writ dism'd) ("When Dr. Olesijuk entered the hospital for treatment and received the same from the hospital and the doctors, there was created an implied contract to pay for such services, and he became liable therefor.")).

Finally, in addition to being deemed to have entered into a common law contract for necessaries, a patient who contracts for hospital services while of unsound mind

may ratify his liability for payment by declaration or conduct if he subsequently regains his mental competency, whether permanently or temporarily. *See Barry v. St. Joseph's Hosp. & Sanitarium*, 48 P. 68, 69 (Cal. 1897) (holding that patient "in a condition of imbecility or great weakness of mind" ratified deed executed to hospital for room, board, care, "and medical attendance in sickness" during "the term of his natural life" when he regained his mental competency shortly before his death), *cited with approval by Newman v. Taylor*, 122 S.W. 425, 426 (Tex. App.—Texarkana 1909, no writ) ("If the insane person recovers his reason, he may ratify the contract and so make it valid.").

At trial, the Hospital proffered responses to an interrogatory and a request for disclosure from Featherly's personal injury suit in which he stated that he had "incurred" $24,682.00 in medical expenses from the Hospital. The first question we must answer is whether this evidence was relevant to the Hospital's theory that Featherly ratified the contract. We conclude that it was.

This sort of litigation conduct may give rise to a ratification if it affirms the existence of an agreement, as is shown by *Harris v. Archer*, 134 S.W.3d 411 (Tex. App.—Amarillo 2004, pet. denied) (op. on reh'g). There, a party sought to rescind a partnership agreement, asserting fraud. *Id.* at 426. However, the court noted that while the party was attempting to distance from the agreement in some regards, the party was also embracing the agreement through other litigation conduct. *Id.* at 428. For instance, the party's "pleadings consistently asserted" the agreement's validity, both through affirmative claims for damages and defensive theories that hinged on the agreement. *Id.*

40

The party also "asserted the validity of the agreements in affidavits, deposition[,] and trial testimony." *Id.* Finally, the party's ultimate prayer for relief was to obtain a stake in the proceeds of a property sale, and he relied in part on the partnership agreement "in taking such position." *Id.*; *see also Granberry v. McBride*, 138 S.W.2d 283, 284–85 (Tex. App.—Texarkana 1940, no writ) (holding grantor seeking cancellation of a deed on the grounds of mental and physical infirmity ratified the deed by failing to raise such incapacity in defense of a previous forcible detainer suit brought for possession by the grantee).

Like the defendant in *Harris*, a party here is attempting to run from an agreement that he appears to have already embraced through litigation conduct. The proffered evidence suggests that Featherly approved the exact amount that the Hospital demanded under the contract—$24,682.00—by quoting it in his interrogatory response as the amount of medical expenses that he incurred and by specifically adopting it in his disclosures as his "method of calculating economic damages." *Cf. Paragon Indus. Applications, Inc. v. Stan Excavating, LLC*, 432 S.W.3d 542, 551–52 (Tex. App.— Texarkana 2014, no pet.) (concluding that there was no ratification because the ratification-proponent paid a *different* amount than what was to be paid under the purported contract). Featherly swore to the interrogatory response, and by endorsing the result of the contract under oath, Featherly arguably manifested his assent and confirmed the contract itself. *See Concho Res.*, 627 S.W.3d at 234. We therefore see a

logical connection between this evidence and ratification.[24] *See Republic Waste Servs.*, 335 S.W.3d at 406.

Moreover, the proffered evidence tended to show that Featherly accepted the benefit of the contract, and a party generally "cannot avoid an agreement by claiming there was no intent to ratify after he has accepted the benefits of the agreement" with knowledge of the agreement. *Mission Petro.*, 449 S.W.3d at 553–54. The backhanded benefit of the contract and the steep hospital bill that ensued was that they gave Featherly leverage to pursue greater damages in his personal injury suit. The evidence suggests that Featherly capitalized on this aspect of the contract, using it to obtain a sizable settlement. If it is proved that Featherly knowingly accepted that benefit, a jury may fairly decide that ratification is shown. This evidence was relevant, and the trial court abused its discretion in concluding otherwise.

---

[24]Featherly argues that he never endorsed the Hospital's claim for $24,682.00, and that he was merely a passive conduit for the Hospital's assertion that $24,682.00 was the amount of the lien. As Featherly paints the scene, he merely relayed the Hospital's demand along to Applebaum. However, in his discovery responses, Featherly couched the $24,682.00 as his own "method of calculating economic damages," not as the Hospital's assertion or demand. Moreover, as discussed in more detail below, the hospital lien statute provides that before Featherly could offer a valid release and thereby obtain a settlement in the personal injury suit, it was Featherly's responsibility to either pay the Hospital's charges or to facilitate their payment as part of the settlement itself. *See* Tex. Prop. Code Ann. § 55.007(a)(1), (3); *Speegle*, 303 S.W.3d at 36. Thus, rather than being a passive mouthpiece for the Hospital, Featherly retained some degree of responsibility to accurately represent his position concerning the reasonableness and necessity of the Hospital's charges in prosecuting his personal injury cause of action and in negotiating its settlement.

42

This is particularly true since, as a matter of law, payment of the Hospital's charges was a condition precedent to Featherly's capacity to provide Applebaum with a valid and enforceable release of liability. *See Langever v. Miller*, 76 S.W.2d 1025, 1026–27 (Tex. 1934) ("The laws, at least as to substantial rights and remedies, existing at the time a contract is made, become a part of the contract."); *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 155 (Tex. App.—Fort Worth 2007, pet. denied) ("This doctrine is based on the presumption that the parties to a contract knew and took into consideration the law in effect at the time of [the] contract."). Once the lien properly attached, the statute expressly withdrew from Featherly the legal capacity to offer, execute, or deliver a valid release as consideration for the settlement of his personal injury cause of action, without first having (1) paid the charges of the Hospital in full, (2) paid the charges of the Hospital "to the extent of any full and true consideration paid to [Featherly] by or on behalf of the other parties to the release," or (3) made the Hospital a party to the release itself. Tex. Prop. Code Ann. § 55.007(a); *see Linnstaedter*, 226 S.W.3d at 411 ("Once the lien is filed, a tortfeasor cannot obtain a release by judgment or settlement unless the hospital's charges are paid in full."); *Speegle*, 303 S.W.3d at 36 (same).

When Featherly offered to release his personal injury cause of action against Applebaum as consideration for her settlement of his claim, an implied term of the release—known to both parties—was the antecedent or contemporaneous payment of the Hospital's lien. Given that Featherly's outstanding discovery responses, sworn and unsworn, represented that the reasonable and necessary amount of hospital expenses

43

he sought as damages was $24,682.00, such responses were relevant to the determination of whether he intended to ratify the admission acknowledgment and consent form he signed when admitted to the Hospital's emergency room, as well as the full amount of the charges made the subject of the Hospital lien. Combined with the agreed motion to dismiss, order of dismissal with prejudice, and the contemporaneous issuance of three settlement checks by Applebaum's liability insurer in the exact amount of the full charges sought by the Hospital, two of which included the Hospital as a payee, Featherly's implied offer to pay the lien off as a condition precedent for his release and his acceptance of the amounts tendered to him in consideration thereof is admissible evidence of his intent to ratify the agreement to pay the Hospital's invoiced charges as both reasonable and necessary.[25]

---

[25]The Hospital also protests the exclusion of the pre-litigation demand letter directed to Applebaum on behalf of Featherly, offering to release her from any and all liability in exchange for $875,000.00, including the implied payment of $24,682.00 to resolve the Hospital's lien. Ordinarily, offers of settlement are inadmissible if offered to prove the validity or amount of a claim. *See* Tex. R. Evid. 408(a); *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex. 1986) (op. on reh'g). The exclusion of such offers furthers the public policy favoring the settlement of lawsuits—a policy frustrated by their use as admissions against interest. *McGuire v. Com. Union Ins. of N.Y.*, 431 S.W.2d 347, 352 (Tex. 1968). The demand letter clearly falls within the ambit of Rule 408, though Featherly has not carried his burden to demonstrate that the discovery responses also fall within Rule 408's purview. *See Vinson Mins., Ltd. v. XTO Energy, Inc.*, 335 S.W.3d 344, 351–52 (Tex. App.—Fort Worth 2010, pet. denied).

We note that offers of settlement are admissible if offered for another relevant purpose, such as prejudice, bias, or interest. Tex. R. Evid. 408(b); *see Vinson Mins.*, 335 S.W.3d at 351–52. We also note that the hospital lien statute clearly anticipates a medical provider's participation in settlement negotiations and embodies a public policy encouraging the immediate treatment of injured individuals by securing the payment of

We also conclude that the error was harmful. The discovery responses were the Hospital's most consequential evidence of ratification—a defensive theory that could have swung the contract claim in the Hospital's favor, netted the Hospital thousands more in recovery, and (at least potentially) headed off the $88,715.01 award for attorney's fees that Featherly received. Indeed, without the admission of this evidence, the trial court refused to even submit the issue of ratification, effectively granting a directed verdict on the Hospital's affirmative defense to a possible mental incapacity finding by the jury—error compounded by the disallowance of the Hospital's common law quantum meruit claim. Because the evidence that Featherly endorsed the contract and the dollar amount of the bill was crucial to the key issue of ratification, the erroneous exclusion of that evidence was harmful and reversible. *See JBS Carriers*, 564 S.W.3d at 836; *LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 699–700 (Tex.

---

hospital charges, which may have implications for the admissibility of a demand letter such as this one. However, the Hospital did not articulate a theory of admissibility consistent with the exceptions recognized by Rule 408(b) or any public policy reason to depart from Rule 408. To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the context. *In re J.C.*, 594 S.W.3d 466, 473 (Tex. App.—Fort Worth 2019, no pet.) (citing Tex. R. App. P. 33.1(a)(1)(A)). Because these arguments were not raised in the trial court, we decline to consider them here.

Finally, the Hospital mentions that the trial court excluded (1) the amount of the settlement that Featherly received in the personal injury suit and (2) testimony concerning Featherly's contentment with that amount. But the Hospital offers no argument or legal authority as to whether this evidence was admissible. Due to inadequate briefing, we decline to consider whether that evidence was erroneously excluded. *See* Tex. R. App. P. 38.1(i).

App.—Dallas 1992, writ denied) (op. on reh'g) (holding that the trial court reversibly erred by excluding "evidence of the dollar amount" of the benefit received by the party who allegedly ratified an agreement because excluding this amount undermined the proponent's effort to show ratification and forced the jury to "try this case blindfolded").

The dissent ventures that this evidence could have also fairly been excluded under Texas Rule of Evidence 403. However, no Rule 403 objection was raised when this evidence was proffered in the trial court, which casts doubt on Featherly's ability to prosecute such a basis for exclusion on appeal. *See SRMOF II 2012-1 Tr., U.S. Bank Tr. N.A. v. Alaimo*, No. 02-18-00336-CV, 2019 WL 3955198, at *5 (Tex. App.—Fort Worth Aug. 22, 2019, pets. denied) (mem. op.); *Keller v. Keller*, No. 02-17-00466-CV, 2018 WL 4782162, at *4 n.3 (Tex. App.—Fort Worth Oct. 4, 2018, no pet.) (mem. op.); *see also Guar. Cnty. Mut. Ins. v. Reyna*, 709 S.W.2d 647, 648 (Tex. 1986) ("We must uphold a correct lower court judgment on any legal theory *before it*, even if the court gives an incorrect reason for its judgment." (emphasis added)); *Sullivan v. Microsoft Corp.*, 618 S.W.3d 926, 930 (Tex. App.—El Paso 2021, no pet.) (collecting cases in which an appellate court refused to affirm based on a ground not presented to the trial court). Moreover, even assuming for the moment that Rule 403 were properly in play, we respectfully differ in our estimation of how the Rule 403 balancing test applies in this case. Our starting point is that "[r]elevant evidence is presumed to be admissible." *JBS Carriers*, 564 S.W.3d at 836 (citing Tex. R. Evid. 402). We have already set forth our

view that this evidence carried great probative value, and only if that probative value were "substantially outweighed" by the danger of unfair prejudice or confusion could the evidence be excluded under Rule 403. *See id.* The dissent identifies Featherly's personal injury settlement as a likely source of unfair prejudice, but the discovery responses had little to do with that settlement. We fail to see how discovery responses reflecting that Featherly incurred $24,682.00 in hospital expenses would have informed the jury that Featherly reached a sizable settlement, as the dissent suggests, because the discovery responses never mentioned the settlement. And the dissent does not identify any other prejudicial aspect to the discovery responses that could have substantially outweighed the evidence's value, which would seem to leave the admission of the responses entirely within bounds under Rule 403.

For all of these reasons, we sustain the Hospital's fourth point. The Hospital is entitled to a new trial.

This conclusion renders it unnecessary to consider the Hospital's first point, in which the Hospital argues that it was improper for the trial court to declare the lien partially invalid because Featherly's prayer was to declare the whole lien invalid.[26] It also

---

[26]*But see Garner v. City of Houston*, 323 S.W.2d 659, 662 (Tex. App.—Houston 1959, no writ) ("We are unable to agree that the specific prayer for cancellation of the whole debt and the lien would prevent the rendition of a judgment cancelling only a part of the debt which would carry with it the extent of the security, that is, the lien. Though he might not on the evidence introduced on a trial be entitled to a cancellation of the whole debt, he would be entitled to a cancellation of so much as was in excess of that which was reasonable. The prayer for cancellation of the whole is not inconsistent with a cancellation of a part. The whole includes the items of which it is

47

renders it unnecessary to consider the Hospital's third point, through which the Hospital complains of charge error. "Because the remaining . . . jury-charge issues may not recur during the new trial on remand, we do not address them." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 728 (Tex. 2016). However, while we generally would not address the Hospital's second issue either, we nonetheless address two questions of law presented by that issue because they are "critical to the correct re-trial of this case." *Steak & Ale of Tex., Inc. v. Borneman*, 62 S.W.3d 898, 901 (Tex. App.—Fort Worth 2001, no pet.).

## B. Availability of Attorney's Fees

In its second point, the Hospital argues that the determination of what constituted "a reasonable and regular rate" for its services under the hospital lien statute was a question of fact that is not the proper subject of a declaratory judgment. To that end, the Hospital urges us to adopt the holding of *Shahin v. Memorial Hermann Health System*, which stated that the reasonable rate for hospital services was a fact question that did not belong in a declaratory judgment. 527 S.W.3d 484, 491 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). In that case, the court held, "While resolving what rates a hospital may charge patients is arguably useful, declaratory judgment is not the proper vehicle, because the question would require the resolution of a factual dispute by competent evidence." *Id.*

---

composed and a prayer for the cancellation of the whole encompasses a prayer to cancel parts.").

Like the *Shahin* court, we have also adopted the general principle that "[d]eclaratory relief is inappropriate where the only issue involved is a question of fact." *City of Watauga v. Taylor*, 752 S.W.2d 199, 205 (Tex. App.—Fort Worth 1988, no writ). But that principle does not apply here because the issues in this case were not solely factual. Indeed, there would be no issue of what constitutes a reasonable and regular rate without the written instrument that is at the heart of Featherly's suit: the Hospital's lien. Any factual issues were adjacent to, and inhered in, Featherly's declaratory action to construe that instrument. Under binding precedent and the text of the Declaratory Judgments Act itself, issues of fact may fairly be resolved in an otherwise proper declaratory action. "A court having jurisdiction to render a declaratory judgment has power to determine issues of fact . . . ." *United Servs. Life Ins. v. Delaney*, 396 S.W.2d 855, 858 (Tex. 1965); *In re Estate of Bryant*, No. 07-18-00429-CV, 2020 WL 1174586, at *2 (Tex. App.—Amarillo Mar. 11, 2020, no pet.) (mem. op.). As the Declaratory Judgments Act expressly provides, "If a proceeding under this chapter involves the determination of an issue of fact, the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." Tex. Civ. Prac. & Rem. Code Ann. § 37.007; *see Trinity Universal Ins. v. Sweatt*, 978 S.W.2d 267, 270 (Tex. App.—Fort Worth 1998, no pet.) ("Further, although resolution of the case involved fact issues because Appellee disputed the conclusions of Appellant's investigation, determination of those fact issues in the same manner as in other civil actions is specifically provided for in the

49

Declaratory Judgments Act." (cleaned up)). The trial court was fully entitled to resolve any questions of fact that inhered in the construction of the Hospital's lien. *See N. Cypress*, 559 S.W.3d at 130 (entertaining a declaratory suit challenging the reasonableness of charges under a hospital lien).

Moreover, we see no reason to closely scrutinize whether this suit runs afoul of *City of Watauga*'s rule that declaratory relief is inappropriate where the only issue involved is a question of fact. Overzealous application of this rule could only bring to the fore the often-elusive distinction between questions of fact and law, forcing litigants to guess whether their declaratory suits, though seemingly based on the construction of written instruments, might nonetheless ultimately be deemed too "factual" to be proper. *See Collier v. Civ. Serv. Comm'n of Wichita Falls*, 764 S.W.2d 364, 366 (Tex. App.— Fort Worth 1989, writ denied) ("The distinction between law and fact has never been a well-settled area of law; the U.S. Supreme Court noted it does not know any 'rule or principle that will unerringly distinguish a factual finding from a legal conclusion.'" (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 288, 102 S. Ct. 1781, 1790 (1982))). And elevating this issue of form any further would only serve the interest of putting an ever-finer point on the "broad and general terms" of the Declaratory Judgments Act, which is meant to be "liberally construed and administered," and would do so at the expense of convenience to practitioners and parties alike. *Cobb v. Harrington*, 190 S.W.2d 709, 714 (Tex. 1945). We therefore side against the Hospital to the extent that it brings an argument in reliance on *Shahin*.

Next, the Hospital contends that it was improper to award Featherly attorney's fees because the hospital lien statute does not provide for attorney's fees, and therefore attorney's fees should not be available in Featherly's declaratory action. According to the Hospital, parties frequently plead other substantive claims as declaratory actions in an effort to obtain attorney's fees, but there are rules in place to prevent the use of duplicative declaratory claims to manufacture the availability of attorney's fees. The Hospital asserts that those rules should apply here.

A party may not use the Declaratory Judgments Act as a vehicle for recovering attorney's fees when the declaratory claims merely duplicate other claims already before the trial court for which attorney's fees are not permitted. *Jackson v. State Off. of Admin. Hearings*, 351 S.W.3d 290, 301 (Tex. 2011); *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). Thus, in *MBM*, the court held that because the plaintiff was ineligible to receive attorney's fees on his breach of contract claim, he should not receive attorney's fees for a declaratory claim that was "merely tacked onto a standard suit based on a matured breach of contract." 292 S.W.3d at 666, 670. Likewise, in *Jackson*, because the plaintiff failed to meet the requirements for recovery of attorney's fees under the Texas Public Information Act, he could not use an "incidental" claim for declaratory relief to obtain the attorney's fees. 351 S.W.3d at 301. The principle of *MBM* and *Jackson* most clearly applies when a declaratory claim is "substantively subsumed within" another claim for which attorney's fees are not available, when the declaratory claim is "part and parcel" of the other claim, or when

51

the declaratory claim "merely duplicates issues already before the trial court" because of the other claim. *12636 Research Ltd. v. Indian Bros., Inc.*, No. 03-19-00078-CV, 2021 WL 417027, at \*18 (Tex. App.—Austin Feb. 5, 2021, no pet.) (mem. op.) (cleaned up).

In this case, however, Featherly pleaded only a claim for declaratory relief and no other causes of action; there was no other fee-ineligible claim for the declaratory claim to mirror. When the declaratory claim stands alone, courts have held that the rule described in *MBM* and *Jackson* does not bar attorney's fees. *See Handwerker Hren Legal Search, Inc. v. Recruiting Partners GP, Inc.*, No. 03-13-00239-CV, 2015 WL 4999054, at \*6 (Tex. App.—Austin Aug. 19, 2015, pet. denied) (mem. op.); *Hansen v. JP Morgan Chase Bank, N.A.*, 346 S.W.3d 769, 775 (Tex. App.—Dallas 2011, no pet.); *ProFinance Assocs., Inc. v. Cohen-Sagi*, No. 04-10-00242-CV, 2011 WL 2150356, at \*5 (Tex. App.—San Antonio June 1, 2011, pet. denied) (mem. op.); *see also Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 915–16 (Tex. 2015).

Indeed, it is debatable that Featherly could have brought any claim for his declaratory action to overlap with, such as by pleading a cause of action to challenge the lien under the hospital lien statute itself, because the hospital lien statute does not clearly provide a private cause of action to challenge hospital liens. To determine whether a statutory provision gives rise to a private cause of action to enforce the provision, our duty is to ascertain the drafters' intent. *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004). The Legislature can signal its intent to create a private right of

action either expressly[27] or through implication.[28] *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 620 S.W.3d 458, 463 (Tex. App.—Dallas 2021, pet. filed). We strictly construe statutory enforcement schemes and infer a private cause of action only when the drafters' intent is clearly expressed in the language as written. *Id.* at 464; *Cernosek Enters., Inc. v. City of Mont Belvieu*, 338 S.W.3d 655, 663 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Witkowski v. Brian, Fooshee & Yonge Props.*, 181 S.W.3d 824, 831 (Tex. App.—Austin 2005, no pet.) (op. on reh'g).

Chapter 55 of the property code does not appear to contain a clear expression of intent, either express or implied, to grant litigants a private cause of action to challenge hospital liens. Thus, it is doubtful whether there was any cause of action under the hospital lien statute for Featherly's declaratory claim to mimic. And even assuming that such a cause of action exists, it is not one that he has pleaded. We therefore conclude that *MBM* and *Jackson* do not preclude Featherly's claim for attorney's fees.[29] We overrule the Hospital's second point.

---

[27] *See, e.g.*, *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 331 S.W.3d 419, 422 (Tex. 2010) (op. on reh'g).

[28] *See, e.g.*, *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins.*, 514 F. Supp. 3d 927, 935–37 (S.D. Tex. 2021) (order).

[29] Finally, the Hospital challenges the amount of the attorney's fees. At this juncture, before a new trial, any opinion on that argument would be advisory. *See Steak & Ale*, 62 S.W.3d at 901.

## IV.   CONCLUSION

We reverse the trial court's judgment and remand for a new trial consistent with this opinion.

Wade Birdwell
Justice

Delivered: April 14, 2022